613 P.2d 1034

**Eliseo Max PEREA, Jr.,
Plaintiff-Appellant,**

v.

**Bruce STOUT, Mel Sedillo, Danny Julian,
Larry Fagan, Lawrence Romero as Sher-
iff of Valencia County, J. Michael Alex-
ander, Ray Anaya and Larry Standard,
Defendants-Appellees.**

No. 4151.

Court of Appeals of New Mexico.

May 29, 1980.

Writ of Certiorari Denied June 26, 1980.

Alfred M. Carvajal, Pedro P. Palacios, Albuquerque, for plaintiff-appellant.

Carlos G. Martinez, Shaffer, Butt, Thornton & Baehr, Albuquerque, for defendants-appellees Sedillo, Fagan, Alexander and Julian.

Robert G. McCorkle, Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, for appellees Stout, Romero, Anaya and Standard.

## OPINION

WOOD, Chief Judge.

This lawsuit involves both action and inaction on the part of eight defendants in connection with matters which resulted in plaintiff being jailed. After reviewing the facts in a light most favorable to the results in the trial court, we discuss: (1) alleged misconduct of defense attorneys; (2) a directed verdict; and (3) five issues concerning instructions, the most important of which is the fifth one—a law officer's defense to a false imprisonment claim.

Stout, an officer of the Game and Fish Department, was patrolling a mesa east of Belen, New Mexico. He observed a pickup, without license plates, being used to cut calves away from the mothers. He saw two calves dogged, tied and loaded into the pickup. This was not a normal ranching operation; "They had cruelly overdriven these calves." Stout, having observed the cruelty and being suspicious of rustling, started working his way toward the pickup with the purpose of investigating the situation. The pickup "took off". Stout followed, using his emergency equipment (red light, siren) in an effort to stop the pickup. The chase ended when the pickup stopped near some trailer houses; the two people in the pickup jumped out and ran. Stout disabled the pickup and apprehended the two people before assistance arrived.

The assistance that arrived consisted of Captain Standard and Lt. Anaya of the sheriff's office, and Officer Fagan, identified as a "brand inspector".

Three calves were found in the pickup. The officers, by use of the radio, were informed that the pickup belonged to plaintiff, and that plaintiff had, that morning, turned in a stolen pickup report to the sheriff's office. The two occupants of the pickup had in their possession checks made out to plaintiff. Stout and Fagan found a cow that would mother one of the calves. The cow was on property of Rancher Bur-

ris. The two occupants of the pickup—Sosa and Hernandez—were taken to jail. The four officers—Standard, Anaya, Stout and Fagan—went to plaintiff's property to investigate the matter.

Plaintiff signed a permission to search for "Possibly Stolen Cattle", and a search was conducted. There is no claim that this search was without plaintiff's consent. During the search, questions were raised about plaintiff raising pheasants without a license and about deer hides. Two other items, however, raised definite suspicions. There were nine freshly branded calves and plaintiff did not have a bill of sale for the calves. See § 77–9–21, N.M.S.A. 1978. There was an unbranded calf with a broken leg. Plaintiff said he had had the calf for a week and that the calf was injured when he got it; however, the wounds were fresh and the calf was still bleeding. These items, together with the stolen vehicle report, caused the officers to believe they should investigate further.

Plaintiff was asked to "come down and give us a statement at the Sheriff's office and he said he would." At the sheriff's office, plaintiff gave a written statement to Stout. Captain Standard telephoned the district attorney and advised the district attorney of what had happened "up to this time." This telephone call was made because the situation involved possible felony charges and the practice was to clear felony charges with the district attorney. The district attorney advised that "we didn't have enough evidence to hold" plaintiff, but to go ahead and charge the illegal aliens (Sosa and Hernandez). The district attorney also advised that he would not be available later on.

Thereafter, plaintiff admitted to Officer Youngblood (not a defendant) and Captain Standard that he had lied in his written statement to Stout. There were at least two lies. One was the stolen vehicle report; plaintiff had loaned his pickup to Sosa and Hernandez, who worked for plaintiff. Another was when plaintiff got the broken-legged calf; the aliens had brought it in about daylight of that day. Plaintiff stated that

"he hadn't paid anything for the calf yet. He also stated it doesn't pay to buy those things."

After these admissions by plaintiff, Captain Standard reviewed matters with Mike Alexander, an investigator for the district attorney's office. Standard discussed matters with Alexander because neither the district attorney nor his assistants were available. "[W]e always did our business with Mike Alexander, because he was always available and he had always given us the right way to go in the past."

Standard asked Alexander "if we could hold him [plaintiff] for investigation. We still had some work to do on the other cattle that were at the Perea residence that he could not produce a bill of sale for. I knew that the Cattle Inspector would want to do that." Standard stated that the investigation would be completed by Sedillo, an investigator for the Livestock Board, and Standard anticipated that it would be "[t]he cattle people" who, ultimately, would be bringing charges.

Alexander "advised Captain Standard that they could hold him up to 72 hours, at the very most, to continue their investigation. Just as soon as they could get a Magistrate, the next work day, to go ahead and file a Complaint."

Standard made the decision to put plaintiff in a cell. This occurred at 5:00 p.m. on Saturday, January 28, 1978. No criminal charges were filed before plaintiff was released at 9:55 a.m. on the following Monday, January 30, 1978. We are not concerned, in this appeal, with the subsequent criminal and civil proceedings involving plaintiff and the various calves.

Plaintiff sought damages from Stout, Standard, Anaya, Fagan and Alexander. Also named as defendants were (a) Sheriff Romero, who was not present at any of the incidents of January 28th; (b) Julian, also a cattle inspector, who arrived at the sheriff's office at some unspecified time during the afternoon of January 28th; and (c) Mel Sedillo, an inspector for the Livestock Board and the supervisor of Fagan and Julian. Sedillo arrived at the sheriff's office after plaintiff had been placed in a cell.

The trial court directed a verdict for Julian at the close of plaintiff's case. The jury verdict was in favor of the other seven defendants. Plaintiff appeals.

*Alleged Misconduct of Defense Attorneys*

Plaintiff claims the trial court erred in failing and refusing to restrict the improper conduct and argument of defense counsel. Plaintiff contends that the two defense counsel deliberately and repeatedly misled the jury to plaintiff's prejudice and characterized plaintiff as a criminal; that the trial court refused to restrict defense counsel to matters properly in evidence and, in addition, permitted defense counsel to instruct the jury as to the law. These claims are not supported by the record.

■ (a) Plaintiff objected to evidence concerning the cattle rustling activity of the aliens, Sosa and Hernandez, claiming the evidence was irrelevant. The theft of the calves was the starting point for the events of the day. This evidence was relevant to the question of why the officers went to plaintiff's property and searched.

■ (b) Plaintiff seemed to claim, at oral argument, that the search and events on plaintiff's property were also irrelevant because the lawsuit involved plaintiff's false imprisonment, and what occurred on plaintiff's property was not relevant to the imprisonment. There are at least two answers to this: 1. The search and events at plaintiff's residence were relevant to why plaintiff was at the sheriff's office that Saturday afternoon and to why plaintiff was ultimately jailed. 2. The amended complaint, on which this matter was tried, set forth three general theories of liability—false arrest, false imprisonment and the violation of various civil rights, constitutional and statutory. During trial, plaintiff did refer to the case as a false imprisonment claim, but he introduced evidence on all three theories and argued all three theories of liability to the jury. The case was not tried solely as a false imprisonment case.

■ (c) In cross-examining plaintiff's witnesses, the defense asked questions concerning plaintiff's knowledge that Sosa and Hernandez were illegal aliens. Plaintiff argues that this questioning falsely accused plaintiff of a crime, and it is no crime to hire Mexican aliens. The difference in words is to be noted; defendant's emphasis was upon the aliens being "illegal", not upon their being "Mexicans". Plaintiff was the employer of Sosa and Hernandez and they lived on plaintiff's premises. Plaintiff, as part of his case-in-chief, introduced evidence of his honesty and good character. Defendant asked the witnesses if their good opinion would change if they knew that plaintiff employed illegal aliens. Such questioning did not accuse plaintiff of a crime.

■ (d) Evidence was introduced about plaintiff's possession of the calves and plaintiff's various statements concerning the calves. A permissible inference from this evidence, particularly the evidence concerning the broken-legged calf, was that plaintiff had knowingly possessed stolen property, which is a crime. This permissible inference did not make the evidence improper or inadmissible because the evidence was relevant in explaining the officers' action and their good faith in doing so.

(e) The claim that defense counsel instructed the jury as to the law is frivolous. Counsel argued to the jury on the basis of instructions given by the trial court.

*Directed Verdict*

When plaintiff rested his case-in-chief, the trial court directed a verdict in favor of Julian. Plaintiff contends that Julian was a joint tortfeasor and, under *Mallard v. Zink*, 94 N.M. 94, 607 P.2d 632 (Ct.App. 1979), it was error to direct a verdict in favor of Julian. Plaintiff also contends that Julian, as a peace officer, had a duty to file charges against plaintiff and Julian failed to perform this duty.

■ Plaintiff's joint tortfeasor claim seems to bottom on the view that almost anyone at the sheriff's office that Saturday afternoon was involved in the matter concerning plaintiff. This view is contradicted by the joint tortfeasor instruction on which

he relies. Under the instruction, the validity of which is not in issue, a joint tortfeasor is defined in terms of united action, "[a]ll those who actively participate in a wrongful act". This approach, requiring a "concert of action" to be a joint tortfeasor, accords with *Cantrell v. Dendahl*, 83 N.M. 583, 494 P.2d 1400 (Ct.App.1972).

The evidence is that Julian was not involved in the arrest of the rustlers and was not involved in the events at plaintiff's residence. At some unspecified time during the afternoon, Julian arrived at the sheriff's office. Plaintiff admitted that Julian did not talk to him and that all that he knew of Julian's involvement was that Julian had a conversation with Fagan, a fellow cattle inspector. Plaintiff overheard one of these two remark that Sedillo, their supervisor, should be contacted. Such evidence was insufficient to raise an issue as to whether Julian was a joint tortfeasor.

■ The claim that Julian failed to file charges is based on the following provision in § 29–1–1, N.M.S.A. 1978:

It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware, and it is also declared the duty of every such officer to diligently file a complaint or information, if the circumstances are such as to indicate to a reasonably prudent person that such action should be taken . . . .

There is no evidence that Julian was aware that plaintiff had violated any criminal law; the most knowledge that can be attributed to Julian is that, whatever he had been told by Fagan and the other officers, Julian's view was that Sedillo should be contacted.

The trial court properly directed a verdict in favor of Julian.

*Instructions*

Plaintiff raised five issues concerning instructions.

■ (a) U.J.I. Civ. 17.9 is an instruction on the duty of jurors to consult with one another. Plaintiff requested that this instruction be given. The trial court did not give this instruction. The record is not at all clear as to why the instruction was not given. A notation on the instruction is ambiguous—the notation might be read as either "withheld" or "withdrawn". Without considering the propriety of attaching a transcript to plaintiff's reply brief, we note that the trial court was of the view that the requested instruction had been withdrawn. This transcript, which plaintiff has brought before this Court, shows the trial court stating: "[M]aybe I had better have a talk with Mr. Carvajal, if he tells me in Chambers he is going to withdraw something then he comes out here and tells the court reporter that he is going to object to it because it was denied."

We assume, but do not decide, that the requested instruction was denied by the trial court. This was not error under *Jewell v. Seidenberg*, 82 N.M. 120, 477 P.2d 296, 49 A.L.R.3d 121 (1970). *Jewell*, supra, dealt with U.J.I. Civ. 17.1, a mandatory instruction. U.J.I. Civ. 17.9 is not a mandatory instruction; the Directions for Use state: "This instruction may be given when the trial court thinks it appropriate."

U.J.I. Civ. 17.9 being an instruction to be given in the trial court's discretion, the appellate issue is whether there was an abuse of discretion. Compare *State v. Lucero*, 88 N.M. 441, 541 P.2d 430 (1975). Nothing shows an abuse of discretion by the trial court in failing to give U.J.I. Civ. 17.9.

■ (b) Plaintiff submitted a requested instruction on the "supervisory liability" of Sheriff Romero. This requested instruction was worded in terms of the supervisor's duty to "train, supervise or discipline" subordinate officers. The instruction would have told the jury that Sheriff Romero should be held liable if he "failed to train, supervise, or discipline officers Standard and Anaya".

Plaintiff objected to the failure to give this requested instruction, but never explained to the trial court the basis for his objection. On appeal, plaintiff asserts the

requested instruction was a part of his theory of the case and contends there was evidence to support such an instruction.

The claim that Romero should be held liable on a theory of supervisory liability was not stated in the amended complaint on which the case was tried, nor is there evidence raising an issue on this theory of liability. The evidence cited to us by plaintiff shows that Romero "tried to have a program to make sure that your subordinate follow the law".

The requested instruction, being neither within plaintiff's theories of the case nor within the evidence, was properly refused.

■ (c) One of plaintiff's theories of liability was that his civil rights had been violated by the failure of the arresting officers to take plaintiff before a magistrate without unreasonable delay. Plaintiff's requested instruction was properly refused, for two reasons.

(1) The requested instruction would have told the jury that, "If a magistrate cannot be found, it is improper to hold the person arrested in jail." That is an incorrect statement of law. Rule of Crim. Proc. for Magis. Cts. 4, provides that an officer arresting without a warrant "shall take the arrested person to the nearest available magistrate court without unnecessary delay." The rule speaks in terms of availability, it does not provide for the arrested person to be discharged if a magistrate is not available. Compare *State v. Gibby*, 78 N.M. 414, 432 P.2d 258 (1967); *State v. Montgomery*, 28 N.M. 344, 212 P. 341 (1923); *State v. Slicker*, 79 N.M. 677, 448 P.2d 478 (Ct.App.1968); *State v. Garcia*, 78 N.M. 777, 438 P.2d 521 (Ct.App.1968). The trial court may properly refuse an erroneous instruction. *Goodman v. Venable*, 82 N.M. 450, 483 P.2d 505 (Ct.App.1971).

(2) The issue of failing to take plaintiff before a magistrate was covered by an instruction given by the trial court and this instruction followed the language of the magistrate court rule. The instruction given adequately covered this issue; accordingly, refusal of the requested instruction,

even if a correct statement of law, would not have been error. *Hudson v. Otero*, 80 N.M. 668, 459 P.2d 830 (1969).

(d) Plaintiff claims that the jury instructions placed the burden on plaintiff "to prove that Defendants acted in bad faith and without probable cause before he could prevail." This claim is frivolous. The jury was told that "probable cause" and "reasonable good-faith belief" of lawful authority "to detain, confine and arrest Plaintiff" were affirmative defenses to be proved by defendants.

(e) The jury was instructed that a law enforcement officer "has no civil liability for an arrest and imprisonment . . . if the officer believed, in good faith, that the arrest and imprisonment was lawful and such belief of the officer was reasonable." Plaintiff claims this instruction injected a false issue into the case.

Plaintiff recognizes that good faith and reasonable belief in the lawfulness of the action taken are defenses to a false arrest claim, citing *Steinbaugh v. Payless Drug Store, Inc.*, 75 N.M. 118, 401 P.2d 104 (1965). Plaintiff claims that these are not defenses to an action for false imprisonment and his claim was solely one of false imprisonment.

Plaintiff has forgotten the basis on which he tried and argued this case to the jury. There were three theories of liability—false arrest, false imprisonment and various alleged violations of civil rights.

■ Even if this case had been one solely of false imprisonment, the defenses were available to defendants. *Steinbaugh v. Payless Drug Store, Inc.*, supra, was a false imprisonment case; the defendants had wrongfully instigated and directed the seizure, detention and search of plaintiff. *Steinbaugh*, supra, states: "reasonable cause is a pivotal question in this class of cases." *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) refers to "the defense of good faith and probable cause . . . available to the officers in the common-law action for false arrest and imprisonment . . . ."

For false imprisonment "there must be evidence or a reasonable inference of unlawful interference with the personal liberty or freedom of locomotion of another." *Martinez v. Sears, Roebuck and Co.*, 81 N.M. 371, 467 P.2d 37 (Ct.App.1970). An arrest and search is within this definition. *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.*, 456 F.2d 1339 (2d Cir. 1972) states:

> [I]t is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection.

See *Ulibarri v. Maestas*, 74 N.M. 516, 395 P.2d 238 (1964).

The judgment in favor of defendants is affirmed.

IT IS SO ORDERED.

LOPEZ and ANDREWS, JJ., concur.