**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARCIE FUERSCHBACH,

      Plaintiff-Appellant,

v.

SOUTHWEST AIRLINES CO.; CITY OF ALBUQUERQUE; DUANE HOPPE; ELDON MARTINEZ; MICHAEL SANTIAGO; and TINA MARIE TAPIA,

      Defendants-Appellees.

No. 04-2117

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-03-540 RHS/LFG)**

---

Thomas P. Gulley, Jontz Dawe Gulley & Crown, P.C., Albuquerque, New Mexico for the Plaintiff–Appellant.

Jeffrey L. Baker (L. Helen Bennett, The Baker Law Firm, Albuquerque, New Mexico; and Duane C. Gilkey and George C. Kraehe, Gilkey & Stephenson, P.A. with him on the briefs), The Baker Law Firm, Albuquerque, New Mexico for the Defendant–Appellees.

---

Before **LUCERO**, Circuit Judge**, BRORBY**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

---

**LUCERO**, Circuit Judge.

Several supervisors at Southwest Airlines convinced two Albuquerque police officers to stage an arrest of Marcie Fuerschbach, a Southwest Airlines employee, as part of an elaborate prank that included actual handcuffing and apparent arrest. This was a "joke gone bad," and turned out to be anything but funny, as Fuerschbach allegedly suffered serious psychological injuries as a result of the prank. She sued the officers and the City of Albuquerque under 42 U.S.C. § 1983, alleging violations of her Fourth and Fourteenth Amendment rights. Fuerschbach also asserted claims for various state torts against the officers, the city, her supervisors, and Southwest Airlines. The district court found that the officers were shielded from the constitutional claims by qualified immunity, and granted summary judgment to all defendants on all other claims. We conclude that Fuerschbach's allegations are sufficient to survive the assertion of qualified immunity. Whether the characterization of the incident as a prank permits the officers to escape liability is a question for the jury to resolve. As such, we **REVERSE** the grant of qualified immunity to the officers. We also **REVERSE** the grant of summary judgment to the officers and the city on several state claims. In all other respects, we **AFFIRM** the judgment of the court below.

## I

Marcie Fuerschbach worked as a customer service representative for Southwest Airlines ("Southwest"), serving travelers at Southwest's main ticket

counter in Albuquerque's Sunport airport.[1]  Southwest prides itself on being a

"fun-loving, spirited company."  This lighthearted image extends from marketing

and customer relations into the company's corporate culture.  As part of this fun-

loving atmosphere, newly hired employees who have successfully completed an

initial probationary period often find themselves subject to a prank

commemorating the occasion.  In one instance, an employee was led onto an

airplane, the doors were sealed, and the employee was flown to Dallas.  Another

employee was dressed in a hula skirt and made to perform a hula dance for

customers.  Aware of this tradition, Fuerschbach knew it was possible that her

colleagues would play a prank on her at the end of her probationary period.

Fuerschbach's supervisor, Tina Marie Tapia, and other customer service

supervisors had discussed various pranks to commemorate Fuerschbach's

successful completion of probation.  Because Tapia had once been subjected to a

similar prank, and had thought the experience amusing, she suggested a mock

arrest.  The others agreed.  On the day of the incident, one of the supervisors

called the Albuquerque police department and requested that officers come to the

Southwest counter.[2]  When Officers Duane Hoppe and Eldon Martinez arrived at

---

[1] In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party, as is appropriate when reviewing a grant of summary judgment.  Fed. R. Civ. P. 56(c).

[2] Apparently the officers took some time to arrive and the supervisors grew impatient.  Noticing a group of Boy Scouts standing in line, they discussed

(continued...)

the ticket counter, the supervisors told them of the plan to arrest Fuerschbach as a celebratory prank. The officers, who were employed by the City of Albuquerque's City Aviation Department and detailed to the Sunport, asked if Fuerschbach "would be okay with it," and Tapia assured them that she would. With the assistance of the supervisors, the officers developed and executed the plan for staging the arrest.

Fuerschbach was working at a ticket counter crowded with customers when the two uniformed and armed police officers approached her. One of the officers ordered Fuerschbach to go with him to answer some questions, and proceeded to escort her to the end of the ticket counter. Once there, the other officer informed Fuerschbach that during the course of performing her background check, the City Aviation Department discovered an outstanding warrant for her arrest. The officers asked Fuerschbach if she had ever been arrested before, and she replied that she had not. When she began to explain that there must have been some mistake, and that there were no outstanding warrants, the officers interrupted her and demanded that she take off her badges and turn them in. Fuerschbach complied and handed her badges to Tapia, who was standing close by. Hoppe and Martinez then asked if Fuerschbach had anyone to "bail her out," and she

---

[2](...continued)
dispensing with the arrest prank and instead merely having the Boy Scouts serenade Fuerschbach. Tapia testified in her deposition that she refused to put the kibosh on the arrest plan, stating: "I felt at the time that I wanted something way more special than just having Boy Scouts sing to her."

responded tearfully that she hoped Tapia would. After asking for a tissue to dry her tears, Fuerschbach asked if the arrest were a joke. Both officers refused to respond. Instead, Hoppe asked if Fuerschbach had any unpaid traffic citations.

The officers then placed Fuerschbach's hands behind her back and handcuffed her tightly. A crowd of employees and customers formed to watch the unfolding arrest. One of the officers said to Fuerschbach, "[w]e don't want to embarrass you anymore so we'll take you to the elevator so we don't have to walk in front of all those people." Fuerschbach continued to cry. The officers led Fuerschbach in handcuffs fifteen feet to the elevator, at which point someone jumped out and yelled, "congratulations for being off probation." The officers removed the handcuffs and people began to clap. Fuerschbach, however, continued to cry. Later that day, she was found in the break room weeping and was sent home. As a result of her distress, Fuerschbach began seeing a psychologist for treatment. The psychologist diagnosed Fuerschbach as suffering from post-traumatic stress disorder ("PTSD").

Claiming a violation of her Fourth and Fourteenth Amendment rights, Fuerschbach sued Hoppe, Martinez, and the City of Albuquerque under 42 U.S.C. § 1983. In the same action she sued Southwest, Tapia, and Michael Santiago, a Southwest manager, for intentional infliction of emotional distress. Claims of conspiracy, false imprisonment, false arrest, assault and battery, and defamation

were asserted against all defendants, along with a claim for punitive damages.[3]

Following discovery and extensive briefing, the district court first granted summary judgment to the officers and the City of Albuquerque. Although finding that Fuerschbach's constitutional rights were violated, the district court found that her rights were not clearly established. On that basis, the court afforded Hoppe and Martinez qualified immunity and dismissed the § 1983 claims asserted against them. Because Fuerschbach "has offered nothing that would indicate that any of the challenged actions were authorized or ratified by the City of Albuquerque," the court granted summary judgment on the § 1983 claims asserted against the city. Concluding that all the state law claims lacked merit, the court granted summary judgment to the officers and the city and dismissed all claims with prejudice. In a separate order, the court granted Southwest, Santiago, and Tapia's motion for summary judgment. The court concluded that the New Mexico Workers Compensation Act barred all claims against Southwest and dismissed the claims asserted against the airline. After reviewing each of the state law claims asserted against Santiago and Tapia, the court determined that the defendants were entitled to judgment as a matter of law. Fuerschbach appeals.

---

[3] The parties filed a stipulated motion to dismiss the defamation claim, which the district court granted.

## II

We review de novo a district court's ruling on qualified immunity. <u>Farmer v. Perrill</u>, 288 F.3d 1254, 1259 (10th Cir. 2002). To determine whether qualified immunity shields a public official from the burdens of litigation, we conduct a two-part inquiry. We first ascertain whether the plaintiff's allegations, if true, amount to a constitutional violation. <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002). If so, the defendant "may nevertheless be shielded from liability for civil damages if [his] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Id.</u> at 739 (citation omitted).

### A

Fuerschbach alleges that Officers Hoppe and Martinez violated her Fourth and Fourteenth Amendment rights. Applicable to the states through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. iv. To determine whether an officer violated the Fourth Amendment, courts must ascertain whether an alleged incident constitutes a seizure and, if so, whether such seizure was unreasonable.

Fuerschbach's allegations, if true, establish that she was seized. A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave." <u>Michigan v. Chesternut</u>, 486 U.S. 567,

573 (1988).  The factors identified in United States v. Hill, 199 F.3d 1143 (10th Cir. 1999), guide our determination of whether a person was, in fact, seized. These factors include:

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . . ; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public.

Hill, 199 F.3d at 1147-48 .  None of these factors are dispositive, nor should they be treated as exclusive, and "it may be that the strong presence of two or three factors demonstrates that a reasonable person would have believed that he was not free to terminate an encounter with government officials."  Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005).  Fuerschbach alleges that she was confronted by two uniformed and armed police officers, told of an outstanding arrest warrant, ordered to accompany the officers, and finally handcuffed and led forcibly toward an exit.  Using the Hill factors to guide our determination, we have little trouble concluding that a reasonable person would not have felt free to terminate the encounter with the law enforcement officers under these circumstances.

Unique to this case is that the seizure arose in the context of a workplace prank.  Given this factual context, a jury could be presented with evidence at trial leading it to conclude that a reasonable person would have felt free to leave.

- 8 -

When reviewing an assertion of qualified immunity, however, we are bound to take the plaintiff's allegations as true. Pelzer, 536 U.S. at 736. Fuerschbach's allegations establish that she thought the arrest was "real," that she did not consent to the seizure, that the officers designed the arrest to look "real," that the arrest appeared "real," and that the officers refused to respond when asked if it were a joke. These allegations, if true, amount to a seizure for qualified immunity purposes. Nevertheless, there remains a disputed issue of material fact for the jury to resolve as to whether, given that the arrest occurred in the context of a workplace prank, a reasonable person in Fuerschbach's position would have felt free to leave. Therefore, our determination that Fuerschbach has satisfied the first prong of the qualified immunity analysis does not preclude a jury finding for the officers on the § 1983 claim.

**B**

Limited by our duty to take all of Fuerschbach's allegations as true, we conclude that the officers' alleged seizure of Fuerschbach was unreasonable. A search or seizure generally requires either a warrant or probable cause. Jones, 410 F.3d at 1227. In limited circumstances, the Supreme Court has carved out narrow exceptions to this general rule. New Jersey v. T.L.O., 469 U.S. 325, 340-41 (1985) ("Ordinarily, a search . . . must be based upon 'probable cause' to believe that a violation of the law has occurred. [However,] we have in a number of cases recognized the legality of searches and seizures based on suspicions that,

although 'reasonable,' do not rise to the level of probable cause."). Examples of such exceptions to the warrant or probable cause requirement include Terry stops, Terry v. Ohio, 392 U.S. 1, 20 (1968), incidents presenting exigent circumstances, Groh v. Ramirez, 540 U.S. 551, 559 (2004), and situations where school officials detain and question a child for the purpose of maintaining or restoring order in a school. T.L.O., 469 U.S. at 341.

In the present case, Officers Hoppe and Martinez not only lacked a warrant or probable cause for seizing Fuerschbach, they lacked any legal basis for doing so. Indeed the conduct alleged in this case would violate the most minimal Fourth Amendment standard, namely that a search or seizure be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. A seizure lacking any legal justification is not justified at its inception. As we held in Jones, "[w]here no legitimate basis exists for detaining [an individual], a seizure is plainly unreasonable." Jones, 410 F.3d at 1228. Even the officers acknowledge that "it might have been manifestly unreasonable and unrelated to any legitimate law enforcement purpose for the Officers to place a random citizen under arrest for no reason whatsoever." Appellees City of Albuquerque, Eldon Martinez, and Duane Hoppe's Opening Br. at 18. As no legitimate basis existed for seizing Fuerschbach, her alleged seizure was unreasonable.

The officers, however, ask us to create an exception to the warrant or probable cause requirement for pranks. Whenever the Court has relaxed the warrant or probable cause requirement, it has done so in furtherance of unique public safety concerns, and only after a careful balancing of the individual interests at stake. See Delaware v. Prouse, 440 U.S. 648, 654 (1979) ("the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."). A false arrest intended as a prank furthers no unique public safety interests, such as those that have justified exceptions to the warrant or probable cause requirement in the past. See Terry, 392 U.S. at 20; Groh, 540 U.S. at 559; T.L.O., 469 U.S. at 341. No court has ruled that an otherwise unreasonable seizure becomes reasonable when the officers intend it as a prank. We will not do so here. When law enforcement officers acting under color of state law seize non-consenting private citizens, they must act in furtherance of legitimate law enforcement interests and on the basis of sufficient facts.

Analogous tort law supports this view. See Memphis Community School Dist. v. Stachura, 477 U.S. 299, 305 (1986) ("We have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability."); Heck v. Humphrey, 512 U.S. 477, 483 (1994) ("[W]e look first to the common law of torts.") Carey v. Piphus,

- 11 -

435 U.S. 247, 257-258 (1978). In discussing intentional torts, the Restatement provides:

> [T]he fact that the defendant who intentionally inflicts bodily harm upon another does so as a practical joke, does not render him immune from liability so long as the other has not consented. This is true although the actor erroneously believes that the other will regard it as a joke, or that the other has, in fact, consented to it. One who plays dangerous practical jokes on others takes the risk that his victims may not appreciate the humor of his conduct and may not take it in good part.

Restatement (Second) of Torts § 13, cmt. c; see also W. Prosser & W. Keeton, The Law of Torts § 8, at 36-37 (5th ed. 1984) ("The defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good."). Numerous state court decisions apply this principle. See, e.g., Caudle v. Betts, 512 So. 2d 389, 391 (La. 1987); Andrews v. Peters, 330 S.E. 2d 638 (N.C. Ct. App. 1985); Pachucki v. Republic Ins. Co., 278 N.W. 2d 898 (Wis. 1979). Thus, the common law of torts instructs that an intentional tortfeasor is held to the applicable standard of care, notwithstanding the characterization of the tort as a prank, or even a good faith but incorrect belief that the tort victim will enjoy the joke. Similarly, a law enforcement officer undertaking to seize a non-consenting private citizen will be held to the governing Fourth Amendment standard; an intent to commit a practical joke will not render the officer immune from liability.

It remains for the jury to decide whether Fuerschbach was in fact unreasonably seized. Moreover, even if a jury were to find that the officers violated Fuerschbach's Fourth Amendment rights, any damages award could account for the joking nature of the encounter. Nevertheless, Fuerschbach's allegations, if true, establish that Hoppe and Martinez seized her without any legitimate justification. Therefore, Fuerschbach's Fourth Amendment claim survives the first prong of the qualified immunity analysis.

C

Because Fuerschbach's allegations demonstrate that the officers violated clearly established constitutional rights of which a reasonable person would have known, her claims clear the second hurdle of the qualified immunity analysis as well. The pivotal inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). We conclude that it would have been clear to a reasonable officer in Hoppe and Martinez's shoes that seizing a private citizen without any legitimate basis was unlawful. Nor would an officer's perception of the seizure as a prank have made the legal standard less clear.

The rule that arrests must be supported by a warrant or probable cause is well established. See, e.g., Dunaway v. New York, 442 U.S. 200, 212 (1979). Even if we were to interpret this incident as a seizure not requiring a warrant or probable cause, the officers actions nevertheless violated Fuerschbach's clearly

established constitutional rights. In Jones we determined that the defendant violated clearly established constitutional rights because the defendant "was on notice that the Fourth Amendment's requirements applied to him, that a seizure would occur within the meaning of that Amendment if at any point the person believed that she was not free to terminate an encounter with him, that the 'free to leave' determination would be informed by the Hill factors, and that any seizure [must at least] be justified at its inception." Jones, 410 F.3d at 1230 (social worker who seized a child at a public school with no lawful basis for doing so violated clearly established rights). Under that standard, Hoppe and Martinez's actions, if true, violated Fuerschbach's clearly established rights. As city police officers, Hoppe and Martinez were on notice that the Fourth Amendment's requirements applied to them. See, e.g., Elder v. Holloway, 510 U.S. 510 (1994). The "free to leave" standard was clearly established. Michigan v. Chesternut, 486 U.S. 567, 573 (1988). So were the standards announced in Hill, 199 F.3d at 1147-48 (decided in 1999), and in Terry, 392 U.S. at 20 (decided in 1968). The plaintiff's allegations, if true, demonstrate that the defendants violated a clearly established constitutional right because the "conduct as alleged constituted a seizure under Hill and was unreasonable under Terry." Jones, 410 F.3d at 1230.

In Jones we held that "[t]he tests enunciated in Hill and Terry are . . . specific," and therefore our rejection of qualified immunity in that case was "based on clearly and narrowly articulated Fourth Amendment principles." Jones,

- 14 -

410 F.3d at 1230. In other words, <u>Terry</u>'s holding that any seizure must at the very least be "justified at its inception," <u>Terry</u>, 392 U.S. at 20, placed all law enforcement officers on notice that seizures without any legal justification would violate the Fourth Amendment. Fuerschbach's right to be free from seizures lacking any legal basis was well known to Officers Hoppe and Martinez at the time of the incident. We therefore conclude that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202.[4]

Fuerschbach's allegations, if true, establish that Officers Hoppe and Martinez violated her clearly established Fourth Amendment right to be free from

---

[4] The officers argue that they had no notice that a prank, which they thought the victim would enjoy, implicated constitutional concerns. It is true that no Supreme Court or Tenth Circuit case has applied the Fourth Amendment where law enforcement officers inform a private citizen that outstanding warrants exist for the person's arrest, and then seize and handcuff the individual, all for the sake of amusement. Nevertheless, the officers are not entitled to qualified immunity simply because no previous court has rejected a prank exception to the Fourth Amendment. <u>See, e.g.</u>, <u>Jones</u>, 410 F.3d at 1230 ("officials committing outrageous, yet sui generis, constitutional violations ought not to shield their behavior behind qualified immunity simply because another official has not previously had the audacity to commit a similar transgression"). A defendant does not gain qualified immunity by asserting a novel exception to a longstanding constitutional rule and then arguing that no case has declined to apply the exception. This is particularly true where, as here, analogous tort law, extant at the time of the incident, has refused to adopt the asserted exception. <u>See</u> <u>Murrell v. Sch. Dist. No. 1</u>, 186 F.3d 1238, 1251 (10th Cir. 1999) (government officials must make "reasonable applications of the prevailing law to their own circumstances.").

unreasonable seizures.[5]  Accordingly, we reverse the district court's order dismissing Fuerschbach's § 1983 claims against the officers on the basis of qualified immunity.[6]

### III

In addition to her claim for relief under § 1983, Fuerschbach asserts several state tort claims against Officers Hoppe and Martinez.  Specifically, Fuerschbach alleges that the officers committed false imprisonment, false arrest, assault and battery, and civil conspiracy.  Finding that the officers were entitled to judgment

---

[5] The officers claim that any injury Fuerschbach suffered was de minimis. They have pointed to no authority, however, establishing that injuries arising from Fourth Amendment violations must be more than de minimis to permit recovery under § 1983.  Nor have the officers persuaded us that suffering PTSD is a de minimis injury.  Referring to Fuerschbach's reaction as "histrionic," "overwrought," and "hysterical" does not aid the officers in that regard, but does constitute a lack of decorum by counsel.  Because Fuerschbach has presented uncontroverted evidence that she has been diagnosed with PTSD, she has demonstrated for summary judgment purposes that her injuries are more than de minimis.  We therefore need not decide whether de minimis injuries resulting from unreasonable seizures are compensable under § 1983.

[6] Fuerschbach's complaint seeks relief for violations of her Fourth and Fourteenth Amendment rights.  The district court granted qualified immunity to the officers on both claims.  To the extent that Fuerschbach alleges Fourteenth Amendment injury simply because the Fourth Amendment is applicable to the states through the Fourteenth Amendment, her claimed Fourteenth Amendment injury survives the assertion of qualified immunity and the district court is reversed.  However, because Fuerschbach presents no case on appeal showing that Officers Hoppe and Martinez violated clearly established Fourteenth Amendment rights, she has waived any appeal of the dismissal of independent Fourteenth Amendment claims.

as a matter of law on all counts, the district court granted the officers' motion for summary judgment.

"We review a district court's grant of summary judgment de novo, using the same standards applied by the district court." Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005). Viewing the evidence and reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party, we will affirm a grant of summary judgment only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because genuine issues of material fact exist as to Fuerschbach's false imprisonment, false arrest, and assault and battery claims, we reverse the district court's grant of summary judgment on these counts. However, because Fuerschbach has failed to provide any argument to support her appeal of the dismissal of her civil conspiracy claim, the district court's grant of summary judgment on that count must be affirmed.[7]

_____

[7] Fuerschbach also appeals the district court's dismissal of her claim for punitive damages. In § 1983 matters, punitive damages will be awarded only when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Punitive damages in state tort suits are available "when the defendant acts with reckless disregard for the rights of the plaintiff – i.e., when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid

(continued...)

- 17 -

## A

"Under New Mexico law, 'false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" Romero v. Sanchez, 895 P.2d 212, 215 (N.M. 1995) (quoting N.M. Stat. Ann. § 30-4-3). False arrest or unlawful detention occurs when the "facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate." Sanchez, 895 P.2d at 215 ("Unlawful detention has similar requirements" to false imprisonment). A defendant possessed of a good faith and reasonable belief in the lawfulness of the action is not liable for false imprisonment or false arrest. See State v. Johnson, 930 P.2d 1148, 1154 (N.M. 1996); Perea v. Stout, 613 P.2d 1034, 1039 (N.M. Ct. App. 1980). The district court found that the officers had a good faith and reasonable belief that their actions were lawful because they only "briefly restrain[ed] Plaintiff as part of a prank at the request of SWA."

Neither the brevity of the seizure nor its characterization as a prank enable the officers to prevail on summary judgment. False imprisonment may arise out of a brief encounter. See, e.g., State v. Corneau, 781 P.2d 1159, 1164 (N.M. Ct.

---

[7](...continued)
the harm." Paiz v. State Farm Fire & Casualty Co., 880 P.2d 300, 308 (N.M. 1994) (quotations omitted). Upon review of the record, we agree with the district court that, viewing the evidence in the light most favorable to Fuerschbach, a reasonable jury could not return an award of punitive damages against any of the defendants.

- 18 -

App. 1989) ("The restraint need be for only a brief time."). Moreover, a good faith belief in the lawfulness of the action ordinarily requires probable cause to arrest. See Johnson, 930 P.2d at 1154 ("a common-law defense to a civil wrongful arrest or a false imprisonment suit also requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances") (emphasis added) (citing with approval Carroll v. United States, 267 U.S. 132, 156 (1925) (cited for proposition that "in cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his peril unless he can show the court probable cause")). The defendant officers lacked probable cause, and indeed did not even suspect Fuerschbach of wrongdoing. Although they seized Fuerschbach at the invitation of her employer, and did so in the context of a prank, they nonetheless had no lawful authority to inform her that she was under arrest, restrain her in handcuffs, and direct her movement. See Diaz v. Lockheed Elecs., 618 P.2d 372, 374 (N.M. Ct. App. 1980) ("False imprisonment involves the unlawful interference with the personal liberty or freedom of locomotion of another. There is no need that the plaintiffs have been held in jail or custody."). Given the well established jurisprudence that a good faith defense to false imprisonment and false arrest ordinarily requires a showing of probable cause, it was error to award the officers

summary judgment under the facts of this case.[8]  We therefore reverse the district court's decision.[9]

**B**

Fuerschbach's claim of assault and battery by Hoppe and Martinez survives summary judgment as well.  For there to be an assault, there must have been an "act, threat or menacing conduct which causes another person to reasonably

---

[8] There remains a triable issue of whether Fuerschbach knew the encounter was part of a prank and consented to participate in it.  See Romero, 895 P.2d at 215 (false imprisonment requires absence of consent); Restatement (Second) of Torts, § 41 ("The custody is complete if the person against whom and in whose presence the authority is asserted believes it to be valid, or is in doubt as to its validity, and submits to it.").  However, summary judgment was clearly inappropriate.

[9] New Mexico has applied different standards in criminal false imprisonment cases and civil false imprisonment cases.  Compare Stout, 613 P.2d at 1039 (applying in civil case the standard "that good faith and reasonable belief in the lawfulness of the action taken are defenses to a false arrest claim") with State v. Barrera, 54 P.3d 548, 550 (N.M. Ct. App. 2002) (requiring as an element in criminal case that defendant have "knowledge that he has no lawful authority to" intentionally confine or restrain the victim) (emphasis added).  Yet, both the New Mexico courts and this court have applied the criminal standard in civil cases.  See, e.g., Romero, 895 P.2d at 215-16 (relying on the criminal statute and holdings in both civil and criminal cases in adjudicating qualified immunity defense); Diaz, 618 P.2d at 376 (Sutin, J., concurring) ("The Penal Code definition governs in civil as well as criminal actions.  Under this statute, defendants are liable if two events occur: (1) defendants intentionally confined or restrained plaintiffs without their consent and (2) defendants knew that they had no lawful authority to do so.") (quotation omitted); Scull v. New Mexico, 236 F.3d 588, 599 (10th Cir. 2000) (when evaluating civil false imprisonment claim under New Mexico law, applying criminal standard that defendants "knew that they had no lawful authority to" intentionally confine or restrain the victim).  Fuerschbach's false imprisonment claim survives summary judgment under either standard.

- 20 -

believe that he is in danger of receiving an immediate battery." N.M. Stat. Ann. § 30-3-1(B).  Battery occurs when an individual "acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . an offensive contact with the person of the other directly or indirectly results."  State v. Ortega, 827 P.2d 152, 155 (N.M. Ct. App. 1992) (citing Restatement (Second) Torts § 18).  The district court granted the defendants' motion for summary judgment, finding that the officers did not intend to cause an offensive contact, but rather that "the officers were courteous and professional," and that in any event, placing an individual in handcuffs is not an offensive contact.

Any bodily contact is offensive "if it offends a reasonable sense of personal dignity."  Restatement (Second) of Torts § 19.  Viewing the evidence in the light most favorable to Fuerschbach, a jury could conclude that the officers' actions offended a reasonable sense of personal dignity.  See Ortega, 827 P.2d at 155 (citing with approval Fisher v. Carrousel Motor Hotel, Inc., 424 S.W.2d 627, 629 (Tex. 1967) (intentionally grabbing a plaintiff's plate constitutes battery because "[t]he intentional snatching of an object from one's hand is clearly an offensive invasion of his person") and Morgan v. Loyacomo, 1 So.2d 510, 511 (1941) (intentionally seizing a package from under a plaintiff's arm constitutes battery)).  A jury could find that placing a person's hands in position to be handcuffed, handcuffing the individual, and then leading the individual to walk fifteen feet

offends a reasonable sense of personal dignity.  See, e.g., Love v. Port Clinton, 524 N.E.2d 166, 167 (Ohio 1988) ("The acts of 'subduing' and 'handcuffing' are undoubtedly offensive to a reasonable sense of personal dignity.").

Moreover, the officers' demeanor is not probative of their intent to cause an offensive contact.[10]  Nor is the officers' intent merely to pull a prank on Fuerschbach an excuse.  See Restatement (Second) of Torts § 20, cmt. a, illus. 1 ("A, intending merely to frighten B, throws a bucketful of water at him.  The water unexpectedly splashes in B's face.  A is subject to liability to B.").  The record reveals that the officers intended to touch Fuerschbach's arms, to place her arms in position to be handcuffed, and to then handcuff her tightly, thus intending to cause an offensive contact.  See  Love, 524 N.E.2d at 167 ("The contact involved is plainly intentional; one cannot accidentally handcuff or subdue another.").  Viewing the evidence in the light most favorable to Fuerschbach, the officers intended to cause an offensive contact with Fuerschbach's person and did cause an offensive contact.  Accordingly, we reverse the district court's grant of summary judgment to the officers on Fuerschbach's assault and battery claim.

---

[10] Because New Mexico has not adopted a specific civil jury instruction for assault and battery, the officers urge us to apply the elements of criminal battery, which include touching "when done in a rude, insolent or angry manner."  N.M. Stat. Ann. § 30-3-4.  It would be incorrect to do so.  In disposing of an appeal in a criminal battery case, the New Mexico Court of Appeals relied upon the elements of civil battery discussed in the Restatement (Second) of Torts.  Ortega, 827 P.2d 155.  Because the court explicitly applied the elements of civil battery in a criminal case, we have little trouble applying those same elements in a civil case.

**C**

Fuerschbach's appeal of her civil conspiracy claim is limited to two sentences, which make no argument, cite to no authority, and direct us to no evidence supporting an appeal of this issue. We therefore determine that she has waived the issue. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived"); Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (deciding that where appellant "fail[ed] to frame and develop an issue," there was insufficient basis for appellate review); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

**D**

The district court granted the City of Albuquerque's motion for summary judgment on all state tort claims because the court found that Officers Hoppe and Martinez committed no tort against Fuerschbach. The city's only argument on appeal is that because its employees committed no tort, it is not liable for any harm to Fuerschbach. Because we reverse the grant of summary judgment to the officers on Fuerschbach's false arrest, false imprisonment, and assault and battery claims, and remand for further proceedings, the city is potentially liable under the doctrine of respondeat superior. Silva v. State, 745 P.2d 380, 385 (N.M. 1987).

- 23 -

We therefore reverse the grant of summary judgment to the City of Albuquerque on the false arrest, false imprisonment, and assault and battery claims.

We affirm, however, the district court's grant of summary judgment to the city on Fuerschbach's § 1983 claims. "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Rather, a municipality can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. at 690. Additionally, a city faces liability under § 1983 if a deprivation of constitutional rights is caused by a municipal "custom." See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1177 (10th Cir. 2003) ("'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law."). It is not clear whether Fuerschbach intends to appeal the district court's grant of summary judgment to the city on her § 1983 claims. Assuming that she does appeal the ruling, we agree with the district court that the allegedly unconstitutional seizure in this case neither implemented nor executed an official policy, ordinance, regulation, or decision by the city. Moreover, the record reveals that the officers were not

acting pursuant to any municipal custom.  The City of Albuquerque is therefore entitled to summary judgment on the § 1983 claims.

**IV**

Fuerschbach seeks damages for false arrest, false imprisonment, assault and battery, intentional infliction of emotional distress, and civil conspiracy against her supervisors Tina Marie Tapia and Michael Santiago, and against her employer, Southwest Airlines.  The district court granted summary judgment to the defendants on all claims, finding that Fuerschbach's sole recourse for compensation is the New Mexico Workers Compensation Act ("WCA").  Because we agree that the WCA precludes Fuerschbach's tort claims, we affirm the grant of summary judgment in favor of Tapia, Santiago, and Southwest.[11]

The WCA provides the exclusive remedy for workplace injuries where, at the time of the incident, (1) the employer has complied with the relevant insurance provisions; (2) the employee is performing service arising out of and in the course of his employment, and (3) the injury is proximately caused by an accident arising out of and in the course of the employment.  N.M. Stat. Ann. § 52-1-9.  The parties' dispute is limited to the third prong and involves whether the mock arrest arose out of employment and whether Fuerschbach's injury was proximately caused by an accident.  If the WCA covers Fuerschbach's injuries, it

---

[11] Appeal of Fuerschbach's civil conspiracy claim is deemed waived for the reasons discussed in § III.C supra.

- 25 -

precludes her from suing both Southwest and her supervisors in tort. See N.M. Stat. Ann. § 52-1-8 ("Any employer who has complied with the provisions of the Worker's Compensation Act relating to insurance or any of the employees of the employer . . . shall not be subject to any other liability whatsoever for the death of or personal injury to any employee, except as provided in the Worker's Compensation Act"); Matkins v. Zero Refrigerated Lines, 93 N.M. 511, 517 (N.M. Ct. App. 1979) ("Under [the WCA], an employee of an employer who has complied with the requirements of the Act is not subject to liability under the common law for the injury or death of a coemployee."). Consequently, whether the WCA applies to the plaintiff's injuries presents a threshold legal question.

### A

Ordinarily, to show that an injury "arises out of employment," a party must show that the claimed injury "resulted from a risk incident to [the] work itself or increased by the circumstances of the employment." Cox v. Chino Mines/Phelps Dodge, 850 P.2d 1038, 1040 (N.M. Ct. App. 1993) (quotation omitted). Although enduring a mock arrest, being waylaid on an airplane and shipped to Dallas, or being conscripted to perform a hula dance for weary travelers may not appear to be a risk incident to employment as an airline ticket agent, courts have acknowledged that acts of "horseplay" may very well arise out of one's employment.

In the earliest workmen's compensation cases, injuries stemming from pranks or horseplay were deemed incompensable. 1A Arthur Larson, Workmen's Compensation Law § 23.10, at 5-181 (1990) ("[j]ust as malicious assaults by co-employees were ruled out as intentional and personal, so sportive assaults were treated as something foreign to the inherent risks of the employment"). In 1920, then-Judge Cardozo led the New York Court of Appeals in a different direction. Determining whether a particular injury caused by horseplay in a factory was one "arising out of and in the course of employment," the court reasoned that "[t]he risks of injury incurred in the crowded contacts of the factory through the acts of fellow workmen are not measured by the tendency of such acts to serve the master's business. Many things that have no such tendency are done by workmen every day." Leonbruno v. Champlain Silk Mills, 128 N.E. 711, 712 (1920). Cardozo famously commented:

> Whatever men and boys will do, when gathered together in such surroundings, at all events if it is something reasonably to be expected, was one of the perils of his service. . . . [I]t was 'but natural to expect them to deport themselves as young men and boys, replete with the activities of life and health. For workmen of that age or even of maturer years to indulge in a moment's diversion from work to joke with or play a prank upon a fellow workman, is a matter of common knowledge to every one who employs labor.' The claimant was injured, not merely while he was in a factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life. The risks of such associations and conditions were risks of the employment.

Id. at 711 (quoting Hulley v. Moosbruger, 93 A. 79, 79 (N.J. 1915)). "[T]his view eventually won the ascendancy in non-participating victim cases." Larson § 23.10, at 5-182.

New Mexico has followed New York's lead, in part because "[t]he sheer number of workers' compensation cases that involve horseplay, and the variety of factual circumstances surrounding the injuries, indicate that horseplay occurs on a daily basis throughout the workplace." Woods v. Asplundh Tree Expert Co., 836 P.2d 81, 84-85 (N.M. Ct. App. 1992). In New Mexico, an incident constitutes compensable horseplay either "if horseplay was a regular incident of employment" or if "horseplay was not a substantial deviation from employment, which the judge would find after considering the extent of the deviation, the completeness of the deviation, the extent to which horseplay was an accepted part of the employment, and the extent to which the nature of the employment may include some horseplay." Cox, 850 P.2d at 1041. The record clearly demonstrates that horseplay, in the form of pranks, was a regular incident of employment at Southwest. Beginning with its training program, Southwest emphasizes to new employees that it is a "different kind of company, fun-loving, that puts a lot of emphasis on fun and spirit." In keeping with that culture, employees completing their probationary period, or having received a promotion, routinely are subject to a prank. These pranks are often elaborate and may involve some degree of embarrassment. In short, enduring a prank as a Southwest

employee "is something reasonably to be expected . . . ." Leonbruno, 128 N.E. at 711.

Fuerschbach, however, argues that the incident giving rise to this case was so egregious that it cannot be considered horseplay. Although we agree that Tapia and Santiago's request of Officers Hoppe and Martinez was ill-considered, the horseplay jurisprudence is broad enough to encompass it. See Woods, 836 P.2d at 85 ("The breadth of the New Mexico view . . . would certainly accommodate an award of compensation under many horseplay circumstances"). Analogous cases from other jurisdictions show that diverse and even more repugnant workplace incidents have properly been considered compensable. See, e.g., Nelson v. Winnebago Indus., 619 N.W.2d 385 (Iowa 2000) (suit claiming false imprisonment and battery, where plaintiff was duct taped from head to toe "like a mummy" in a prank to commemorate his transfer); Diaz v. Newark Industrial Spraying, Inc., 174 A.2d 478 (N.J. 1961) (co-employee threw bucket of lacquer thinner on plaintiff; thinner was immediately ignited by nearby flame causing serious injuries); Tilly v. Dep't of Labor & Indus., 324 P.2d 432 (Wash. 1958) (employee died of cerebral hemorrhage after being chased and held by co-employees); Johnson v. Zurich General Accident & Liability Ins. Co., 161 So. 667, 668 (La. Ct. App. 1935) (night watchman died of heart attack after pranksters disarmed him and carried him across a bridge, telling him that they were liberating prisoners held at the parish jail. Court ruled that it makes no

difference "that the whole matter was a joke. It was real to deceased. The scheme was concocted with the idea of severely frightening him."). Without approving of Tapia and Santiago's judgment in recruiting Officers Hoppe and Martinez to engage in a mock arrest, we are persuaded that their actions amount to horseplay for purposes of this analysis. Therefore, we agree with the district court that Fuerschbach's injuries arose out of employment.

**B**

The WCA applies only to injuries "proximately caused by an accident." N.M. Stat. Ann. § 52-1-9. Fuerschbach argues that the incident giving rise to this litigation was not an accident, and therefore her employer and co-employees are exposed to tort liability.

"[W]hen an employer willfully or intentionally injures a worker, that employer, like a worker who commits the same misconduct, loses the rights afforded by the [Workers Compensation] Act." Delgado v. Phelps Dodge Chino, Inc., 34 P.3d 1148, 1150 (N.M. 2001). Actual intent to injure is not required; willfulness suffices and occurs when "(1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the injury to occur, or has utterly disregarded the consequences of the intentional act or omission; and (3) the intentional act or omission proximately causes the worker's injury." Id. Dispute between the parties centers on the

- 30 -

second prong, which turns on "an examination of the subjective state of mind of" the supervisors. Id. at 1156. "If the worker or employer decided to engage in the act or omission without ever considering its consequences, this prong is satisfied. If, on the other hand, the worker or employer did consider the consequences of the act or omission, this prong will be satisfied only when the worker or employer expected the injury to occur." Id.

Although they grossly miscalculated Fuerschbach's reaction to the mock arrest, Tapia and Santiago did consider the consequences of their actions. Therefore, Fuerschbach can prevail only by showing that her supervisors expected the alleged injury – in this case, psychological injury – to occur. Even viewing the evidence in the light most favorable to Fuerschbach, there is no question that Tapia and Santiago expected all involved, including Fuerschbach, to be amused by the prank. The record demonstrates that Tapia and Santiago considered the consequences of the mock arrest and in no way expected Fuerschbach to suffer psychological injury.

## C

In a final attempt at avoiding the WCA's bar to her state tort claims, Fuerschbach argues that because "there is no provision in the WCA that allows a claimant to recover for the intentional torts of assault, battery, false imprisonment, false arrest or intentional infliction of emotional distress," the WCA cannot apply to her claims. Appellant's Br. at 46. Fuerschbach cites to no

- 31 -

authority for the proposition that the WCA covers only injuries arising from specifically named torts, and we have found no authority that agrees with her. It is true that "the WCA will preclude other claims only if the injury falls within the scope of the WCA." Coates v. Wal-Mart Stores, Inc., 976 P.2d 999, 1004 (N.M. 1999). For instance, injuries caused by sexual harassment, id., sex discrimination, Sabella v. Manor Care, 915 P.2d 901 (N.M. 1996), intentional spoliation of evidence, Coleman v. Eddy Potash, Inc., 905 P.2d 185 (N.M. 1995), and retaliatory discharge, Michaels v. Anglo-American Auto Auctions, Inc., 869 P.2d 279 (N.M. 1994), do not fall within the WCA's purview, and the New Mexico Supreme Court has held that suits for those torts are not barred by the WCA.

New Mexico courts have not ruled the WCA inapplicable to injuries arising from assault or battery. New Mexico jurisprudence does, however, apply the WCA to injuries stemming from horseplay, and "[i]t is hard to imagine a form of horseplay that causes injury that is not either an assault or a battery." Park Oil Co. v. Parham, 336 S.E. 2d 531, 534 (Va. Ct. App. 1985). Nor have New Mexico courts ruled that injuries arising from false imprisonment, false arrest, or intentional infliction of emotional distress fall outside the WCA's scope, and Fuerschbach has provided us with no reason to so conclude. Rather, New Mexico's approach to WCA applicability demonstrates that the injuries alleged in this case fall squarely within the WCA's coverage.

In Manor Care, the New Mexico Supreme Court ruled that the WCA applies to physical and psychological injuries stemming from a supervisor's sexual assault on an employee. The WCA does not apply, however, to claims of sex discrimination and retaliation. What distinguishes injuries arising from sexual assault from claims arising from sex discrimination, is that the "the essence of the [former] is personal injury," which is the peculiar type of injury covered by the WCA. Manor Care, 915 P.2d at 905-06. In the present case, Fuerschbach seeks recovery for psychological injury stemming from assault, battery, false imprisonment, false arrest and intentional infliction of emotional distress. This is similar to the psychological injury resulting from sexual assault in Manor Care, and distinguishable from non-personal injuries such as sex discrimination, retaliation, and intentional spoliation of evidence. See, e.g., Nelson, 619 N.W. 2d at 389 ("mere labeling of a claim for injuries as false imprisonment or battery because in some circumstances those torts may be compensable without a physical injury cannot avoid the exclusivity of workers' compensation if the gist of the claim is for [personal] injury"); Larson § 68.34(a), at 13-180 ("if the essence of the action is recovery for physical injury or death, including in 'physical' the kinds of mental or nervous injury that cause disability, the action should be barred even if it can be cast in the form of a normally non-physical tort.").

Fuerschbach's alleged injuries fall within the scope of the WCA. Because her injuries stem from an act of horseplay, we conclude that they arose from her

employment with Southwest. Additionally, her supervisors neither intentionally nor willfully injured her. Therefore, the WCA's exclusivity provision bars all Fuerschbach's tort claims against Southwest, Tapia, and Santiago.

## V

We **REVERSE** the district court's grant of qualified immunity to Officers Hoppe and Martinez on Fuerschbach's § 1983 claim for violation of her Fourth Amendment rights. We **REVERSE** the grant of summary judgment to the officers on Fuerschbach's state tort claims of false imprisonment, false arrest, and assault and battery and **REVERSE** the district court's grant of summary judgment to the City of Albuquerque on these claims as well. We **AFFIRM** the district court's grant of summary judgment to all defendants on Fuerschbach's civil conspiracy claim and her claim for punitive damages and **AFFIRM** the grant of summary judgment to Southwest Airlines, Tapia, and Santiago on Fuerschbach's assault, battery, false imprisonment, false arrest, and intentional infliction of emotional distress claims. We **REMAND** this case to the district court for further proceedings consistent with this opinion.